Charles M. Tebbutt, WSBA #47255
Jonathan Frohnmayer, *pro hac vice*
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel: (541) 344-3505
Fax: (541) 344-3516

*Additional Counsel Identified on Signature Page*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, INC., a Washington Non-Profit Corporation; FRIENDS OF TOPPENISH CREEK, a Washington Non-Profit Corporation, | Case No. 1:19-CV-3110-TOR<br><br>CONSENT DECREE |

*and*

CENTER FOR FOOD SAFETY, INC., a
Washington D.C. Non-Profit Corporation,

Plaintiffs,

*v.*

AUSTIN JACK DECOSTER, an individual,
DECOSTER ENTERPRISES, LLC, a
Delaware limited liability company,
AGRICULTURAL INVESTMENT-FUND
II, a Delaware limited liability company,
IDAHO AGRI  INVESTMENTS, LLC, an
Idaho limited liability company, IDAHO
DAIRY HOLDINGS, LLC, and Idaho
limited liability company, DRY CREEK
DAIRIES, LLC, an Idaho limited liability
company, WASHINGTON DAIRY
HOLDINGS, LLC, a Washington limited
liability company; WASHINGTON AGRI
INVESTMENTS, LLC, a Washington

CONSENT DECREE ~ 1

1    limited liability company; DBD
2    WASHINGTON, LLC, a Washington
     limited liability company; *and* SMD, LLC, a
3    Washington limited liability company,
                Defendants.
4

5

6        **WHEREAS,** Plaintiffs Community Association for Restoration of the

7    Environment, Friends of Toppenish Creek, and Center for Food Safety (collectively

8    "Plaintiffs") filed a Complaint on May 23, 2019, and a First Amended Complaint on

9    November 8, 2021, in this Court seeking declaratory and injunctive relief, as well as

10   attorney and expert witness fees and costs, against DBD Washington, LLC, SMD,

11   LLC, Washington Dairy Holdings, LLC, Washington Agri Investments, LLC,

12   Austin Jack DeCoster, DeCoster Enterprises, LLC, Agricultural Investment Fund-

13   II, LLC, Idaho Agri Investments, LLC, Idaho Dairy Holdings, LLC, and Dry Creek

14   Dairies, LLC (collectively "Defendants," "DBD," or the "Dairies"), alleging

15   violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*

16   ("RCRA"). Plaintiffs' Complaint for alleged RCRA violations was brought under

17   the citizen suit provisions of Section 7002 of the Act, 42 U.S.C. § 6972(a)(1)(A) and

18   (B);

19       **WHEREAS,** prior to filing their Complaints, Plaintiffs sent to Defendants

20   Notices of Intent to Sue dated February 11, 2019, April 15, 2019, April 3, 2020, and

21   December 23, 2020, in which they stated their intent to assert claims that Defendants

have violated and continue to violate Section 7002(a) of RCRA by contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste in such a manner that may present an imminent and substantial endangerment to health and the environment. 42 U.S.C. § 6972(a);

**WHEREAS,** Plaintiffs further assert that Defendants employ, and have employed, improper manure management practices that constitute the "open dumping" of solid waste in violation of Section 4005(a) of RCRA. 42 U.S.C. § 6945(a);

**WHEREAS,** DBD Washington, LLC and SMD, LLC, Washington Agri Investments, LLC, and Washington Dairy Holdings, LLC are registered as limited liability companies in the State of Washington; Dry Creek Dairy, Idaho Dairy Holdings, LLC, and Idaho Agri Investments, LLC, are registered as limited liability companies in the State of Washington; DeCoster Enterprises, LLC and Agricultural Investment Fund-II, LLC are registered Delaware limited liability companies. These Defendants, along with Austin Jack DeCoster, collectively own and operate the dairies known as "DBD Washington," "SMD," and the "Heifer Ranch." DBD Washington is located at or near 5111 Van Belle Road in Outlook, Washington; SMD is located at or near 211 Nichols Road in Outlook, Washington; and the "Heifer Ranch" is located across from SMD on the south side of Outlook Road;

**WHEREAS,** Defendants deny all claims, including that they violated and

CONSENT DECREE ~ 3

continue to violate Section 7002(a) of RCRA by contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid and hazardous waste in such a manner that may present an imminent and substantial endangerment to health and the environment. 42 U.S.C. § 6972(a).

**WHEREAS**, Defendants further deny that they employ, and have employed, improper manure management practices that constitute the "open dumping" of solid waste in violation of Section 4005(a) of RCRA. 42 U.S.C. § 6945(a); Defendants DBD and SMD further allege that they have at all times relevant to this matter held Concentrated Animal Feeding Operation Permits, and that all conduct during the relevant time frames has been subject to oversight, regulation and enforcement of such Permits by the Washington State Department of Ecology.

**WHEREAS**, after consultation with their respective counsel, Plaintiffs and Defendants (collectively the "Parties") hereby wish to settle this lawsuit to avoid the risks of further litigation and appeal and to resolve the controversy between them; and

**WHEREAS**, the Parties acknowledge that this Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation, and the Court, in entering this Consent Decree, finds that this Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE**, without the admission of any issue of fact or law

except as provided in General Provisions, and upon consideration of the mutual promises contained herein, it is **ADJUDGED, ORDERED, AND DECREED** as follows:

## GENERAL PROVISIONS

1.      This Court has jurisdiction over the Parties and the subject matter of this lawsuit pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 13912(b). This Court shall have continuing jurisdiction over this lawsuit for the purposes of interpretation, enforcement, and, if necessary, modification of this Consent Decree.

2.      The undersigned representative for each Party certifies that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree and to legally bind the Party to it.

3.      The terms "Dairies' Facilities" and/or "Dairies" shall refer to the facilities commonly known as DBD, SMD, and the "Heifer Ranch," as depicted on the maps attached hereto as Exhibit 1[1], and such property that may be acquired as part of Dairy Operations (defined below). These operations are collectively referred to herein as "DBD."

4.      The term "Dairy Operations" includes all aspects of the commercial

---

[1] The referenced exhibits are located at ECF No. 180 as attachments and incorporated herein by this reference.

CONSENT DECREE ~ 5

production of milk from cows, including but not limited to the related operations of heifer raising, compost, manure management, manure application, manure storage in lagoons and catch basins, the production and storage of silage and other animal feed materials, and the production of agricultural commodities that use manure products from the foregoing aspects of the commercial production of milk from cows.

5.    The Dairy Operations are operated jointly and constitute a large Concentrated Animal Feeding Operation (CAFO) under state and federal law.

6.    This Consent Decree shall apply to and be binding upon the Parties to this lawsuit and upon all successors and assigns of the Parties until termination. This provision is intended to require compliance with this Consent Decree so long as any portion of the Dairies is used by any person or entity in the course of conducting Dairy Operations or any other CAFO operation or manure processing or treatment facility. However, nothing herein shall prevent Defendants from discontinuing any or all Dairy Operations (whether independently or together) or from transferring any of the Dairies' Facilities to other owners for uses other than for CAFO Operations; this Consent Decree shall no longer apply to real property that is not being used for CAFO Operations or other agriculturally-related operations that involve the treatment and/or storage of manure. DBD, or any of their successors or assigns, may sell the Dairies' Facilities, or any of the real property upon which the Dairies or their operations may currently be conducted, without Plaintiffs' consent and without

CONSENT DECREE ~ 6

approval of the Court; provided, however, that DBD provide a copy of the Consent Decree to the new owner and provide written notice to Plaintiffs of the sale within thirty (30) days of closing.

7.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Consent Decree and the subject matter of this lawsuit. The Parties hereby acknowledge that there are no representations or understandings relating to the lawsuit or its settlement other than those expressly contained within this Consent Decree. This Consent Decree expressly supersedes, extinguishes, and replaces all prior stipulations and agreements between the Parties.

8.     This Consent Decree may not be modified in any material respect except by explicit written agreement of the Parties that is approved by the Court. Non-material modifications may be made by the Parties upon written consent.

9.     This Consent Decree constitutes the full and complete settlement of all claims, rights, demands, and causes of action of any kind, alleged or unalleged, known or unknown, relating to DBD's Dairy Operations, through the date of entry of the Consent Decree, that Plaintiffs asserted or could have asserted against DBD in this lawsuit. Plaintiffs hereby release all such claims and covenant not to sue DBD in connection with them. This covenant not to sue in no way releases DBD from compliance with this Consent Decree or future compliance with other applicable law.

Furthermore, this covenant not to sue shall in no way limit Plaintiffs' ability to enforce the terms of this Consent Decree or any future violations of law committed by DBD.

10.     Each Party acknowledges and represents that it has relied on the legal advice of its attorneys, all listed at the end of the Consent Decree, who are the attorneys of its own choice, and that the terms of this Consent Decree have been completely explained to the Party by its attorney(s), and that the terms are fully understood and voluntarily accepted.

11.     In the event that any part of this Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is severable from the remainder of the Consent Decree without frustrating its essential purpose or imposing an inequitable result on any party, then the remaining parts of the Consent Decree shall remain valid, binding, and enforceable.

12.     If for any reason the Court should decline to approve this Consent Decree in the form presented, then the Parties agree to continue negotiations in good faith in an attempt to cure the objection(s) raised by the Court to entry of this Consent Decree.

13.     This Consent Decree may be signed in counterparts, and such counterpart signature page shall be given full force and effect.

14.     The Dairies meet the federal and state law definitions of a large

concentrated animal feeding operation or "CAFO." 40 CFR § 122.23. In operating the Dairy Facilities, DBD shall abide by this Consent Decree, their combined CAFO permit, Dairy Nutrient Management Plans ("DNMP"), and the Washington Dairy Nutrient Management Act, RCW 90.64, *et seq*. If any of the terms of this Consent Decree are stricter than the aforementioned laws, then the terms of this Consent Decree shall control. If any of these laws are stricter than the terms of the Consent Decree, either now or in the future, such stricter laws shall apply. Notwithstanding the foregoing, the Parties agree that nothing in this Consent Decree may be construed to obligate DBD to violate any law or regulation. In the event of any perceived conflict, the Parties agree to submit the matter to the dispute resolution process described in Paragraph 59.

## **LAGOONS**

15.     Defendants hereby agree to either double-line or abandon DBD Lagoon Nos. 1, 2, 3, 4, and 5, SMD Lagoon No. 3, and any new lagoons constructed on the property. DBD agrees that all lined lagoons under this Consent Decree must use a drain liner that meets GRI – GM13 Standard Specification (e.g., AGRU "Drain Liner") overlain by a 60-mil textured HDPE liner, with incorporated leak detection, as described in Exhibit 2. DBD agrees that lagoons to be abandoned shall strictly comply with the lagoon decommissioning specifications detailed in Paragraph 20.

16.     DBD Lagoon No. 5 and SMD Lagoon No. 3 are currently empty with

CONSENT DECREE ~ 9

manure liquid and solids removed and will remain empty until lined. DBD shall line DBD Lagoon No. 5 and SMD Lagoon No. 3, with such lining to be completed no later than 6/30/24.

17.     DBD Lagoon Nos. 1, 2, and 4 are currently utilized for manure storage. DBD Lagoons 1 and 2 will be emptied with solids removed by 8/1/2023. DBD Lagoon 4 will continue to be used until Lagoon 5's lining has been completed and put into service. Lagoon 4 shall be emptied and solids removed no later than 9/30/2024. Following the removal of its contents, DBD Lagoons 2 and 4 shall remain empty until lined or abandoned pursuant to Paras. 15, 18 and 19. DBD shall crop DBD Lagoons 1, 2, and 4 with Triticale or Alfalfa, with no nutrient addition, and DBD shall take reasonable measures to timely remove accumulations of rainwater or runoff. DBD Lagoon 1 will be closed no later than December 31, 2025.

18.     DBD Lagoon No. 3 is currently empty with manure liquid and solids removed and shall remain empty until lined or abandoned. DBD shall crop DBD Lagoon 3 and plant with Triticale or Alfalfa, with no nutrient addition, in 2023. DBD shall take responsible measures to timely remove accumulations of rainwater or runoff. DBD Lagoon 3 shall remain empty until lined or abandoned pursuant to Paragraphs 15, 18 and 19. At DBD's option, Lagoon 3 may be combined with Lagoon 2 prior to any lining. All further decisions on lining, including those of Lagoon Nos. 2, 3 and 4, shall take into account whether the enzyme or oxygenation treatments, or

both, used in the Pilot Projects shall be applied to those specific areas. No enzyme or oxygenation treatment shall be required if: 1) the average composite samples from seven (7) borings in the soils above the water table do not exceed 45 ppm nitrate plus ammonium and ground water downgradient from the lagoon does not exceed 10 ppm nitrate plus ammonia or 1 ppm nitrite; 2) the soils exceeding 45 ppm nitrate plus ammonium are excavated and land applied properly; or 3) if the cropping removes the excess of 45 ppm nitrate plus ammonium. Upon completion of the Remediation Investigation, the Parties shall confer about whether excavation, pump and treat, enzymatic treatment, oxygenation treatment, or some combination thereof, or no further action, are best suited for each area.

19.    Prior to lining, all liquids and organic solids shall be removed from the lagoons. Following removal of manure liquids and solids from the lagoons all lagoons being cropped will be irrigated with the enzyme technology.

### Lagoon Decommissioning

20.    All Lagoon abandonment projects and closures shall be completed according to all the following terms:

a) *Lagoon Closure – Permanent Decommissioning* requirements of Section S4.B.1.f of the January 18, 2017, CAFO General Permit (combined), which is also S4.C.4.E. of the January 6, 2023, permit, issued by the Washington State Department of Ecology, or

whatever more stringent protocol may be in place at the time;

b) Guidance provided by *NRCS Conservation Practice Standard 360 – Waste Facility Closure (NRCS, WA September 2018* or other guidance then in effect);

c) Conduct topographic surveys extending to a minimum of 50 feet beyond the edge of each lagoon, or to adjacent roads or lagoons, whichever is closest, and containing the location of existing utilities;

d) Removal of all liquids and organic solids from the lagoons;

e) Following removal of liquids and solids from the lagoons, DBD shall remove material from floor of the lagoon until undisturbed ("pre-construction") soils are encountered. The decommissioned lagoons shall be cropped with the purpose of extracting excess soil nutrients while the parties conduct the pilot studies contemplated by Paras.21-23, below;

f) All piping infrastructure to and from abandoned lagoons shall be removed or, if not practicable, cut and capped in place.

21.   All information collected and analyzed pursuant to Paragraph 20 shall be provided to Plaintiffs contemporaneously with receipt by DBD, but in no case more than five (5) business days from receipt by DBD.

CONSENT DECREE ~ 12

### *Groundwater Pilot Programs*

22.     The Parties have jointly devised a focused Pilot Program to determine the feasibility and efficacy of their respective visions for potential remediation of the excess nitrate and ammonium contamination of the soil and groundwater beneath the Dairy lagoons, excluding DBD Lagoon 5 and SMD Lagoon 3, each of which shall be double-lined. Plaintiffs envision oxidating the variable levels of ammonium in the soil profile in order to transform it into nitrate, speeding up leaching it into the aquifer, and then pumping it out as irrigation water. DBD envisions an enzyme/electrokenetic trial that may reduce or eliminate nitrate altogether. Plaintiffs have prepared a Remediation Investigation Plan (RI) that is attached hereto as Exhibit 3. DBD agrees to allow and cooperate with the provisions of the RI, subject to the following limitations: 1) the RI will not begin unless first permitted and authorized by Department of Ecology. The parties shall have one hundred-eighty (180) days from the entry of this Consent Decree to complete the RI; 2) the RI cost for Plaintiffs' work as outlined in the RI, to be paid by Defendants, shall not exceed $80,000; and 3) the parties shall provide each other all the data, field notes, and analyses collected under the RI within thirty (30) days of receipt of such information, but in no case no later than 9/30/23 (unless delays contemplated by this Decree occur). Defendants shall provide all data collected during investigation or sampling activities at the Dairies.

23.     Each Party's Pilot Program shall be conducted during 2023 through

CONSENT DECREE ~ 13

2025 with the expectation that the Pilot Programs may be able to be completed by the end of 2024. DBD shall pay for Plaintiffs' implementation of its proposed Pilot Project. Plaintiffs shall undertake no Pilot Program activities, including no activities contemplated under the RI, unless first authorized and permitted by the Department of Ecology. Plaintiffs' representatives may visit their pilot area as often as reasonably necessary, provided that: Plaintiffs shall provide twenty-four (24) hours' notice before visiting their respective pilot area, including the names of the visitors and the approximate hours of visitation. No agents of Plaintiffs shall remain on the Dairy Facility before 8:00 a.m. or after 5:00 p.m., or on weekends, without the advance written permission from DBD. All costs for Plaintiffs' pilot program, separate from the RI, shall not exceed $220,000 at DBD or SMD, such sum to be paid by Defendants. The Parties shall exchange the results of their respective Pilot Programs within ninety (90) days of completion, but in no case later than 12/31/2025. DBD shall additionally submit a report no later than such date analyzing the results of its other control, containment, and retrieval methods, including but not limited to its cropping of empty lagoons and its efforts to uptake ammonium through cropping.

24.     After exchanging the results of their respective Pilot Programs, the Parties shall confer in good faith for a period of no more than ninety (90) days, as implementation of possible results of the Pilot Program may lead to earlier remediation of the ongoing contamination, about whether either Pilot Program should

be utilized at the Dairies' Facilities to remediate the nitrate and ammonium contamination of the soils and groundwater underlying the Dairies' lagoon footprints. If the Parties are unable to agree, then the Parties shall submit their dispute to a neutral arbitrator for resolution. Should the Parties be unable to agree on a willing and available arbitrator within such ninety (90) days, they shall apply to the Court to appoint one. DBD shall pay the fees of the arbitrator. In evaluating the Parties' proposals, the Parties request that the arbitrator base their decision on the scientific results achieved by the respective Pilot Programs, the nitrogen levels still remaining beneath the respective footprints of the lagoons, and the relative costs of the proposed remediation. The mediator shall have discretion to award fees to Plaintiffs if they are the substantially prevailing party on any arbitrated issues. Should the Pilot Programs be delayed for good cause (such as permitting delays), the dates for lagoon lining and reporting may be adjusted by the Parties as minor modifications to this Consent Decree without approval of the Court.

## <u>GROUNDWATER MONITORING</u>

25.    DBD has installed thirteen (13) groundwater monitoring wells at locations generally depicted on the map attached hereto as Exhibit 4. Additional RI wells shall be installed by DBD under Plaintiffs' oversight. DBD shall monitor these wells on the same schedule until the Pilot Project is complete. Plaintiffs shall take a complete round of samples of all wells upon installation of the additional RI wells,

CONSENT DECREE ~ 15

which will count toward one of the quarterly samples noted below. The Dairies shall quarterly sample and analyze the wells within the Monitoring Well Network on the following schedule: June, September, December, and March. Following the first eight quarterly samples, sampling at the Monitoring Well Network shall occur on a semi-annual basis (twice per year; June and December) until four consecutive testing events show the average nitrate concentration in each well, calculated from the prior four sampling events from each well, is below the Maximum Contaminant Levels (MCL) of 10 ppm nitrate and 1 ppm nitrite. For purposes of the nitrate MCL number, "nitrate" shall include nitrate and ammonia together.

26.    The quarterly sampling for the Monitoring Well Network includes solely the parameters identified below:

### *Laboratory Parameters*

- Nitrate (as nitrogen) by U.S. Environmental Protection Agency (EPA) Method 300.0

- Nitrite (as nitrogen) by EPA Method 300.0

- Chloride by EPA Method 300.0

- Ammonia (as nitrogen) by EPA Method 350.1 or Standard Method 4500-NH3 G (methods are equivalent)

- Total phosphorus by EPA Method 365.1 or Standard Method 4500-P E (methods are equivalent)

- Total Kjeldahl nitrogen by EPA Method 351.2 or Standard Method 4500-Norg C using colorimetric detection (methods are equivalent)

*Field Parameters*

- pH, dissolved oxygen, groundwater elevation, oxidation reduction potential, specific conductivity (using a field meter to determine when water is ready to be sampled).

27.    DBD agrees to provide to Plaintiffs, in electronic form, the laboratory results of each groundwater sampling event within fifteen (15) days of the date DBD receives the results. Results from the Dairies' selected, certified laboratory shall be the official results for determining compliance with the Consent Decree, unless a sampling or laboratory error makes the results inaccurate. In the event that the Dairies choose to use a different laboratory for monitoring well data capture, the Dairies shall so notify Plaintiffs. So long as the Dairies' selected laboratory is certified by the State of Washington Department of Ecology, Plaintiffs shall not unreasonably withhold agreement for DBD to change laboratories.

**MANURE APPLICATION AND FIELD MANAGEMENT**

28.    The provisions of this Section shall apply only to Application Fields owned, leased, or otherwise controlled by Defendants, including any Application Fields Defendants own, lease, or otherwise control after the Effective Date and during the term of this Decree. All such Application Fields owned, leased, or otherwise

CONSENT DECREE ~ 17

controlled by Defendants shall be addressed in Defendants' DNMP.

29.   For purposes of this Decree, Defendants shall be deemed to "control" an Application Field to which manure is applied when (a) the manure is applied by Defendants' employees or Defendants' contractors using Defendants' or Defendants' contractor's trucks or application equipment; (b) when the amounts/rates of application are not dictated by the recipient; and (c) when Defendants are not meaningfully compensated for such manure.  For purposes of this subparagraph, reimbursement for fuel costs is not considered meaningful compensation.

30.   With respect to nitrogen, Defendants shall adhere to the following beginning in the Fall of 2023:

a.   Defendant shall make nitrogen applications at or below agronomic rates based on Application Field-specific nutrient management budgets prepared by an agronomist.

b.   No later than January 31, 2025, Defendants shall have their agronomist conduct a retroactive review of their agronomic rate calculations and field nutrient performance data for crop years 2022-2024 and document that review in a report ("Agronomic Rate Report"). This review shall assess whether, taken as a whole, the agronomic rate calculations have adequately projected nutrient utilization within the bounds of good agronomic practice with the parallel goal of minimizing

leaching potential to groundwater.

        c.     Defendants' agronomist's review of nutrient utilization shall include the mineralization of residual soil nitrogen, the availability of nitrogen from applied manure, the extraction of nitrogen by crops and the status and trends of residual nitrogen in the Application Fields.

        d.     In the event that Defendants' management of manure in crop years 2022-2024 has followed its agronomist's recommendations based on agronomic rate calculations, evidence requiring adjustments to the agronomic rate calculations shall include excessive amounts of residual soil nitrogen (greater than 15 ppm) occurring consistently in some application fields or failure to reach 15 ppm in twenty-five percent (25%) or more of Defendants' Application Fields.

        e.     Defendants shall submit to Plaintiffs in accordance with the Notice provisions in Paragraph 62 a draft of the Agronomic Rate Report for Plaintiffs' review and comment no later than April 30, 2025. Defendants shall consider any comments Plaintiffs submit to Defendants on the draft Agronomic Rate Report if Plaintiffs deliver such comments to Defendants in accordance with the Notice provisions in Paragraph 62 no later than forty-five (45) calendar days after Defendants provide Plaintiffs with the draft Agronomic Rate Report. Defendants shall finalize the Agronomic Rate Report no later than July 30, 2025, and send a copy to Plaintiffs upon completion. If the conclusions of the finalized Agronomic

Rate Report indicate a need to adjust the agronomic rate calculation assumptions, such conclusions shall be implemented by Defendants beginning with crop year 2026 summer crop and through the termination of this Decree.

        f.    Defendants shall restrict their manure application in the manner described in the following Table 1:

**Table 1. Manure Application Restrictions for Nitrogen Control**

| Fall Average Residual N in Upper 2 feet (NH$_4$-N+NO$_3$-N) | Nitrogen Application Restrictions Based on Measured Fall Average Residual Soil Nitrogen Levels (NH$_4$-N+NO$_3$-N) | | | | Split Application Schedule for Manure Applied by Irrigation (Crop Year 2025+ Only) | |
|---|---|---|---|---|---|---|
| | Crop Year 2024 (Fall 2023) | Crop Year 2025 (Fall 2024) | Crop Year 2026 (Fall 2025) | Crop Year 2027+ (Fall 2026) | Portion of winter crop application made in fall (Oct-T200) | Portion of winter crop application made in spring (After T200) |
| ≤ 15 mg N/kg | 100% of agr. rate | 100% of agr. | 100% of agr. | 100% of agr. | ≤ 100% | Balance |
| 15.1-25 mg N/kg | 100% of agr. rate | 100% of agr. rate | 95% of agr. rate | 90% of agr. rate | ≤ 66% | Balance |
| 25.1-35 mg N/kg | 95% of agr. rate | 85% of agr. rate | 80% of agr. rate | 75% of agr. rate | ≤ 33% | Balance |
| 35.1-45 mg N/kg | 90% of agr. rate | 80% of agr. rate | 70% of agr. rate | 60% of agr. rate | 0% | Balance |
| > 45 mg N/kg | No appl. | No appl. | No appl. | No appl. | — | — |

        g.    For purposes of interpreting Table 1:

            i.    Nitrogen agronomic rate limitation shall apply to both the winter and summer crop, unless follow-up soil nitrogen measurements fall into a

lower category, or crop tissue (basal stem and leaf sampling) measurements show a deficiency in the crop tissue for nitrogen.

        ii.     For crop year 2025 and thereafter, winter manure applications will be split into a fall and early spring application as indicated in Table 1 for fields to which manure is applied by irrigation.

        iii.    If a given Application Field exceeds 25 mg N/kg for three (3) years in a row after crop year 2025, then Defendants shall reduce the application limit for that field from 75% to 50% until the nitrogen level drops below 15 mg N/kg.

        iv.    If a given Application Field exceeds 35 mg N/kg for two (2) years in a row after crop year 2025, then Defendants shall apply no manure to that field until the nitrogen level drops below 15 mg N/kg.

        h.    Nitrogen levels used to determine compliance with Table 1 shall be measured by the average of nitrate-nitrogen plus ammonium-nitrogen in each of the top two feet of the soil column based on Fall post-harvest sampling results.

        i.    Agronomic rate adjustments shown in Table 1 shall be applied after completing the standard agronomic rate calculation. For example, if a standard agronomic rate calculation indicates a need for 2.0 million gallons of manure, and if the restricted rate in Table 1 is "90 percent of agronomic rate", then the maximum manure application for that Application Field will be 1.8 million gallons (2.0 million

gallons x 90% = 1.8 million gallons).

   j. For the Application Fields to which Defendants apply manure via irrigation or blending, Defendants shall split the winter manure application into a fall and early spring application. The amount of the split shall be adjusted based on Fall residual soil nitrogen level as indicated in Table 1 for crop year 2025 and beyond.

  31. With respect to phosphorus, Defendants shall adhere to the following beginning on the Effective Date:

   a. Defendants shall measure available phosphorus at the 0-1-foot and 1-2-foot levels in its Application Fields in parallel with fall soil nitrogen testing.

   b. Defendants shall maintain their Application Fields in the low-risk category as measured using the current NRCS approved phosphorus index procedures.

   c. Defendants shall maintain phosphorus levels in its feed ration at a level less than 0.4% phosphorus measured on a total ration dry matter basis.

   d. Defendants shall continue physical manure solids separation for enhanced solids recovery, as well as composting and exports to reduce on-Dairy applications of manure and wastewater.

  32. With respect to phosphorus, in addition to the requirements in Paragraph 31 above, and beginning in the crop season that commences after

CONSENT DECREE ~ 22

Defendants' Fall 2026 post-harvest sampling, Defendants shall restrict their manure application in the manner described in the following Table 2:

**Table 2. Manure Application Restrictions for Phosphorus Control**

| Fall Average Available P in Upper 2 feet (mg Olsen P/kg) | Total annual application based on P (Crop Year 2027+) |
|---|---|
| < 40 mg P/kg | Control for N |
| 41-100 mg P/kg | 90% of crop extraction |
| 101-180 mg P/kg | 80% of crop extraction |
| 181-300 mg P/kg | 25% of crop extraction |
| > 300 mg P/kg | No application |

     a.    Defendants shall apply the requirements in Table 2 to each of their Application Fields based on the average fall post-harvest measurements of available phosphorus measured in the top 2 feet of the soil column in each Application Field.

     b.    Defendants shall adhere to the requirements in Table 2 during the crop year following the Fall compliance measurements or until resampling has shown that the requirements in Table 2 are no longer required (e.g., an Application Field measuring 45 ppm P in fall is retested in spring and measures 38 ppm P).

     c.    Based on the Fall available phosphorus measurements, the requirements in Table 2 shall be implemented and followed for the duration of the Consent Decree.

     d.    For purposes of Table 2, phosphorus extraction rate limitation

shall apply to the full crop year, unless follow-up soil available phosphorus measurements fall into a lower category.

e.    The annual limits on phosphorus application listed in Table 2 are expressed as a function of the estimated annual phosphorus extraction rate of the crops (extraction rate = tons crop/acre x P content/ton crop) grown on each field during the crop year. The annual application amount will be based on the fall available P levels and will be split in most cases into multiple applications, with the total annual amount applied limited to the Table 2 values.

33.    Defendants shall implement a soil moisture monitoring program at the Application Fields in accordance with the following requirements:

a.    For purposes of this paragraph, a "Soil Moisture Monitoring Period" begins two weeks prior to Defendants' first irrigation or manure application event in each Application Field through at least two weeks after Defendants' final irrigation or manure application event in each field.  During most years, the Soil Moisture Monitoring Period will extend from mid-March through early November.

b.    During the Soil Moisture Monitoring Periods in 2023, 2024 and 2025 (the "Three Year Test Period"), Defendants shall install and operate a set of irrigation sensors to monitor soil moisture levels in eight (8) representative Application Fields as illustrated in Exhibits 5a-b.  For Application Fields that contain soils with significantly different nitrate leaching potential or water holding capacity,

as indicated by the Natural Resources Conservation Service ("NRCS"), Defendants shall deploy and operate soil moisture sensors in each of two representative soil series. The locations of the soil moisture sensors are shown on the maps attached hereto as Exhibit 6.

      c.    Defendants shall install sensors in each location at the following three approximate depths (variable by +/- two inches):  0.5-foot, 1.5-feet and 2.5-feet.  If rocky or indurated soil properties in any location preclude effective placement of the 2.5-foot sensor after three independent boring attempts, Defendants shall not be required to install the 2.5-foot sensor in that location(s), but shall document for each of those location(s) the total depth of soil to the point of boring refusal.

      d.    To verify field capacity estimates, Defendants shall calibrate sensors at the time of installation using a gravimetric sample approach where soil water is measured on a weight basis. Soil bulk density measurements used in calibration shall be confirmed for each sensor location at each depth.  Calibration shall be reported in the first Annual Report (described in Paragraph 33(h)) along with Application Field capacity estimates for each monitoring location at each depth.

      e.    Defendants shall calibrate any replacement sensors in a similar manner as in Paragraph 33(d), and these calibrations shall be reported in the Annual Report (described in Paragraph 33(h)) for the year in which the sensors were

replaced. Defendants shall have at least two (2) replacement sensors available at the Dairy in case of failure of installed sensors.

f.    Defendants shall use best efforts to maintain the sensors in an operational condition throughout the Soil Moisture Monitoring Period. Defendants shall implement necessary maintenance, repairs or replacement of the sensors with the goal of minimizing operational down-times to twenty-one (21) days for the two shallowest depths and fifteen (15) days for the sensors at 2.5 feet.

g.    During the Three-Year Test Period, Defendants shall use the soil moisture sensors to validate and, if necessary, adjust its irrigation rates to meet crop needs while minimizing exceedances of Application Field capacity in the 2.5-feet soil level as follows:

i.    Defendants shall obtain weekly irrigation needs estimates from an agronomist using the Evapotranspiration method.

ii.    Defendants shall irrigate their Application Fields consistent with the recommended values unless soil moisture sensors indicate an exceedance of field capacity at the 2.5-feet level.

iii.    If soil sensors from the prior week indicate exceedances of Application Field capacity at the 2.5-feet level, Defendants shall adjust the recommendation for future irrigation rates downward from what would otherwise be provided using the Evapotranspiration method, with the goal of decreasing and

maintaining soil moisture levels below field capacity at the 2.5 feet level. Defendants shall track both the original and any adjusted recommendations on a weekly basis throughout the Three-Year Test Period.

iv.    For the first two fields with an irrigation-related exceedance of Application Field capacity at the 2.5 feet level during the Three-Year Test Period, Defendants' Fall soil monitoring shall include a one-time sampling on each such Application Field that shall extend to the 5-feet depth in that Application Field (or to the depth of refusal).  For each sample, Defendants shall analyze at 3 feet, 4 feet, and 5 feet for ammonia-N and nitrate-N and Olsen P.  The resulting sampling data shall be provided to Plaintiffs consistent with the Notice provisions.

h.    No later than February 28 in the year after the end of each Soil Moisture Monitoring Period during the Three-Year Test Period (i.e., for the 2023 Soil Moisture Monitoring Period, this date would fall on February 28, 2024), Defendants shall provide Plaintiffs pursuant to the Notice provisions in Paragraph 62 with an Annual Report containing Defendants' initial and adjusted weekly recommendations and the monitoring data for each soil moisture sensor in tabular format. Monitoring data provided for each sensor location shall consist of a complete digital file (.xlsx, .xls, or .csv) and a graphical readout showing measured moisture levels for the 0.5-foot, 1.5-feet and 2.5-feet sensors throughout each Soil Moisture Monitoring Period, with notes summarizing any encountered sensor performance

issues, any completed repairs, and notes documenting the dates, amounts, and rates (gallons/acre) of irrigation water and manure applications in the Application Field where the sensor is located. Defendants shall also provide in the Annual Report local daily precipitation data for the year using publicly-available weather data from the nearest reliable weather station.

      i.    If during the 2025 Soil Moisture Monitoring Period the moisture sensor readings show a pattern of ongoing irrigation-related exceedances of field capacity at the 2.5-feet depth (i.e., three or more exceedances, not counting exceedances immediately following precipitation events), then Defendants shall maintain moisture sensors in the Application Field where such sensor exceedances were reported until no more than one (1) exceedance is recorded in that field during the Soil Moisture Monitoring Period.

34.    Beginning on the Effective Date, Defendants shall for the duration of this Decree maintain application records of (a) any manure it hauls to and applies to an Application Field; and (b) any manure it applies to Application Fields through irrigation or blending. Such records shall include the Application Field ID; the manure quantity (volume); characteristics (blended or straight); date of application; and a link to the manure nutrient testing information. Defendants shall keep separate application records in the event they conduct multiple applications on different days.

35.    No later than January 31 of each year beginning in 2024 and for each

CONSENT DECREE ~ 28

year for the duration of the Consent Decree, Defendants shall provide to Plaintiffs PDF copies of manure management records for the prior crop year via electronic mail (at the addresses listed in Paragraph 62). Records that Defendants shall provide pursuant to this paragraph are listed in Exhibit 7.

36.    Any manure management records routinely generated by Defendants in compliance with its CAFO permit and similar regulatory requirements shall be kept on-site at the Dairy for five (5) years from the date of generation. No more than once per calendar year, Plaintiffs shall have the right to request access to conduct an on-site review of the manure management records for which they have not been provided copies pursuant to Paragraph 35.

37.    Defendants shall use flow meters on all Application Fields to which they apply lagoon water through irrigation or blending.

## UNDERGROUND CONVEYANCE INSPECTION

38.    No later than December 31, 2024, DBD shall inspect the wastewater and manure lines being utilized between the sump, settling basins, milking parlors and the lagoons at the Dairies as attached hereto as Exhibit 8. If the inspection shows that repairs need to be made in any of those lines, Defendants shall make the necessary repairs, which could include cutting and permanently capping such lines, no later than December 31, 2024.

39.    Inspection and any required repair work shall be performed by an

experienced and qualified contractor.

40.    For gravity draining lines, the following equipment shall be used:

- Lines 6-inch or greater – jet and "crawler" camera

- Lines less than 6-inch – use a push camera.

41.    Once inspection and any required repairs are completed, Defendants shall submit to Plaintiffs a written description of the activities Defendants undertook pursuant to Paras. 41-43, which shall include documentation of the lines inspected and the exact location(s) of any repair(s) made.

## SILAGE AREA

42.    DBD shall store all silage harvested in 2023 or after on asphalt or concrete pads at all times throughout the duration of the Consent Decree. DBD shall ensure that the silage pads are sloped to drain to a lined collection sump.

## SITE DRAINAGE

43.    DBD agrees to complete a Stormwater budget and Site Drainage Plan for SMD, the Nichols and Van Belle containment pens, and the Heifer Ranch facilities by no later than 6/30/24, and shall complete the site drainage improvements no later than 6/30/25, which shall include at least one lined lagoon at the heifer ranch to capture all site runoff.

44.    DBD shall provide to Plaintiffs copies of the site improvement plans for each facility within fifteen (15) days of completion. Plaintiffs shall have forty-

five (45) days to review and provide comments on the drainage plans. DBD shall incorporate Plaintiffs reasonable comments into the improvement plans. Any disagreements shall be subject to the Paragraph 59 Dispute Resolution process.

## COMPOST AREAS

45.     Defendants shall compost manure only on the compost area (the "Area"), attached hereto as Exhibit 9.

46.     No later than December 31, 2023, DBD shall complete the following elements:

a)  Survey the Area topography to 1-foot vertical contours.

b)  Design a grading plan to provide and maintain a two (2) percent average slope for drainage over the Area with no negative slopes measured on a 10-foot distance and route stormwater and other liquids to specific collection locations such as ditches, swales, and/or sumps. The Parties acknowledge and agree that maintenance of windrows and normal operations may over time impact the slope in isolated points. Defendants nevertheless commit to the normal and customary maintenance of such area, and to timely identify and eliminate, as weather and conditions allow, any instances where the slope is lost and water is allowed to pond.

c)    Collect five (5) bulk samples of soil from random locations within the Area for laboratory analysis. Samples will be collected from the 0- to 12-inch depth interval below the final grade surface based on the grading plan. Final grade, and samples, shall be of native soils only.

d)    Samples will be analyzed for: (1) particle size by ASTM D6913 – *Standard Test Methods for Particle-Size Distribution (Gradation) of Soils Using Sieve Analysis* and ASTM D 7928 – *Standard Test Method for Particle-Size Distribution (Gradation) of Fine-Grained Soils Using the Sedimentation (Hydrometer) Analysis* and; (2) compaction characteristics ("Proctor") by ASTM D1557 – *Standard Test Methods for Laboratory Compaction Characteristics of Soil Using Modified Effort (56,000 ft-lbf/ft3 (2,700 kN-m/m3))*.

e)    Following analysis, the five samples will be remolded and compacted to 95 percent of standard Proctor; the remolded samples will be analyzed for hydraulic conductivity by ASTM D5084 – *Standard Test Methods for Measurement of Hydraulic Conductivity of Saturated Porous Materials Using a Flexible Wall Permeameter* to determine if the soils achieve a permeability of

less than $1 \times 10^{-4}$ cm/s at 95 percent compaction.

47.    Prior to December 31, 2024, the Area will be graded according to plan and compacted to meet specifications.

48.    During compaction, soils will be tested in-place by ASTM D6938 – Standard Test Method for In-Place Density and Water Content of Soil and Soil-Aggregate by Nuclear Methods (Shallow Depth) at a frequency of one (1) test per 25,000 sq. ft. of area to verify 95 percent compaction.

49.    Verification of a two percent average grade will be based on completion of post-grading survey at one-foot contour level.

50.    Following grading, lined or asphalt concrete collection ditches or strip drains, and lined or concrete collection sumps, will be installed at approximately the locations depicted in Exhibit 10. (The lining details in Exhibit 10 are in reference only to the trenches, and not to the lagoons.)

51.    Once completed, DBD shall submit to Plaintiffs a written description prepared by a Washington State licensed professional engineer of the activities DBD undertook with respect to this work. The Licensed engineer shall certify and stamp that the site meets slope and compaction requirements of this agreement.

## CLEAN DRINKING WATER PROJECT

52.    The purpose of the Clean Drinking Water Project ("CDWP") payment is to provide alternative clean drinking water to residents in the area near the Dairies.

All aspects of the program shall be managed by the CDWP; the Dairies' only obligation is to provide the agreed-upon funding. Should anyone contact the Dairies regarding alternative water supplies they shall be redirected to the CDWP, who will bear the sole responsibility for any such alternative supplies (except for properties owned by the Dairies, in which case the Dairies shall be solely responsible).

53.     Defendants shall make a one-time payment of $25,000 to CDWP within thirty (30) days of entry of this Decree.

## ATTORNEYS' AND EXPERT WITNESS FEES AND COSTS

54.     Plaintiffs shall be considered the prevailing party for purposes of settlement. DBD shall wire Plaintiffs $250,000 to the Law Offices of Charles M. Tebbutt, P.C., 941 Lawrence St., Eugene, Oregon 97401, ATTN: Charles Tebbutt, within seven (7) days of entry of this decree; provided Tebbutt has provided copies of billing records sufficient to establish fees and expenses of at least that amount. Within sixty (60) days of entry of this consent decree, at DBD's option, it may either pay Tebbutt the remaining sum owed consistent with the billing records heretofore provided and thereby resolve all costs and fees that could have been sought by Plaintiffs; or alternatively, DBD may demand that Plaintiffs file a motion for an award of attorneys' fees, expert witnesses' fees and costs incurred in this litigation. The Dairies shall have the right to respond to Plaintiffs' submission in the ordinary course and as per the Federal Rules of Civil Procedure and the Court's local rules. Any award of

CONSENT DECREE ~ 34

fees and costs to the Plaintiffs shall be reduced by the $350,000 in payments already made by the Defendants with the balance due within thirty (30) days of the Court's order.

55.    DBD shall, in addition to payments made pursuant to Paragraph 54 above, pay Plaintiffs to monitor implementation of this Decree ("Monitoring Costs") as indicated in the following Table 3:

**Table 3. Monitoring Costs**

| Date | Amount DBD Shall Pay to Plaintiffs |
|------|-----------------------------------|
| Within seven (7) days of entry of this Decree, for the remainder of 2023 | $30,000 |
| 1/01/2024 | $40,000 |
| 1/01/2025 | $40,000 |
| 1/01/2026 | $30,000 |
| 1/1/2027 | $30,000 |
| 1/1/2028 | $15,000 |
| By 1/1 each year thereafter if termination has not occurred | $2,000 |

56.    Such Monitoring Costs do not include work performed by Plaintiffs' experts with regard to the Remediation Investigation and the oxygenation Pilot Project, or implementation thereof. Defendants shall fund $300,000 in an escrow account for payment of Plaintiffs' RI and oxygenation Pilot Project within ten (10) days of

approval of the work by Department of Ecology. The escrow funds shall be paid to and managed by the Law Offices of Charles M. Tebbutt. Payments for services shall be made from the escrow account within thirty (30) days of receipt of invoices unless Defendants object in writing to specific payment concerns. Any disputes shall be resolved through the Dispute Resolution process set forth in Paragraph 59. By January 15 of each year commencing in 2025, the Parties shall confer to determine whether additional escrow payments, and the amount thereof, shall be deposited until implementation of the Pilot Project decisions are complete. If the Parties cannot agree, the matter shall be submitted to Dispute Resolution per Paragraph 59.

57. The Parties shall use best efforts to minimize Plaintiffs' Monitoring Costs. For instance, the Parties shall maintain open communication with each other; DBD shall provide required documentation in a timely manner to Plaintiffs; and Plaintiffs shall attempt to bundle activities and associated site visits where possible.

## TERMINATION

58. This Consent Decree and all obligations set forth herein shall terminate on December 31, 2028, if all determinative wells meet the requirements, and except for those obligations specifically noted herein to terminate at other times, including obligations based on construction schedules defined herein. Termination may occur earlier than 2027 if the determinative wells from all remediated areas show groundwater at less than 10 mg/l for nitrate (including ammonia) and 1 mg/L nitrite.

CONSENT DECREE ~ 36

## DISPUTE RESOLUTION

59.     In the event of any dispute regarding implementation, interpretation, or compliance with this Consent Decree, the Parties shall first attempt to informally resolve the dispute through meetings of the Parties. Any Party to this Consent Decree may initiate the informal dispute resolution process by serving, through its counsel, written notice of a request for a dispute resolution on the other Party's counsel. The Parties will attempt to have the Court appoint an arbitrator to resolve disputes that may arise as part of the implementation of this Consent Decree. Any costs of the arbitrator shall be borne by Defendants. If an arbitrator is agreed upon, then the Parties may each submit their respective positions to the arbitrator within thirty (30) days of a writing by either side that the Parties were unable to reach a resolution among themselves or as otherwise instructed by the arbitrator. If no arbitrator is agreed upon, and resolution is of a dispute is not reached within thirty (30) calendar days of the date of that notice of a request for dispute resolution is served, then the Parties may resolve the dispute by filing motions with the Court.

## EFFECTIVE DATE

60.     The effective date of this Consent Decree shall be the date upon which the Court enters in the civil docket a copy of this Consent Decree signed by the Court.

## FINAL JUDGMENT

61.     Upon approval and entry of this Consent Decree by the Court, this

Consent Decree shall constitute a final, non-appealable judgment of the Court under Rules 54 and 58 of the Federal Rules of Civil Procedure.

## NOTICES

62.    Whenever notice is required to be given or a document is required to be sent by one party to another under the terms of this Consent Decree, it shall be directed to the individuals at the addresses specified below, unless prior notice of a change has been given to the other Party. Notice under this Consent Decree shall be effective on the date of service through electronic mail.

For Plaintiffs:    Charles M. Tebbutt, charlie@tebbuttlaw.com

Jon Frohnmayer, jon@tebbuttlaw.com

Daniel C. Snyder, dsnyder@publicjustice.net


For DBD:    Jay Carroll, jcarroll@hnw.law

Scott Stephen, scott.stephen@agrimgt.com

John Glessner, jwglessner@aol.com
Drboffice@embarqmail.com
Drboffice2@embarqmail.com


Any Party may change either the notice recipient or the address for providing notice to it by serving the other Parties with a notice setting forth such new notice recipient or address.

///

CONSENT DECREE ~ 38

*///*

**WE HEREBY CONSENT to the Entry of this Consent Decree.**

**Community Association for Restoration of the Environment, Inc.**

By:    _____

Name:         <u>signature appearing at ECF No. 180</u>

**Friends of Toppenish Creek, Inc.**

By:    _____

Name:         <u>signature appearing at ECF No. 180</u>

**Center for Food Safety, Inc.**

By:    _____

Name:         <u>signature appearing at ECF No. 180</u>

*Plaintiffs*

**DBD Washington, LLC**

By:    _____

Name:         <u>signature appearing at ECF No. 180</u>

**SMD, LLC**

By: _____

Name:        <u>signature appearing at ECF No. 180</u>

**AUSTIN JACK DECOSTER**

By:        <u>signature appearing at ECF No. 180</u>

**DECOSTER ENTERPRISES, INC.**

By: _____

Name:        <u>signature appearing at ECF No. 180</u>

IT IS SO ORDERED THIS 20th DAY OF June 2023.

THOMAS O. RICE
United States District Judge

Respectfully submitted this   9th day of June, 2023.

<u>/s/ Charles M. Tebbutt</u>
Charles M. Tebbutt, WSBA #47255
Jon Frohnmayer, *pro hac vice*
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
charlie@tebbuttlaw.com
jon@tebbuttlaw.com
Tel: (541) 344-3505
Fax: (541) 344-3516

CONSENT DECREE ~ 40

/s/ Daniel C. Snyder
Daniel C. Snyder, *pro hac vice*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Tel: (202) 861-5251
dsnyder@publicjustice.net
/s/ Andrea K. Rodgers
Andrea K. Rodgers, WSBA #38683
Law Offices of Andrea K. Rodgers
3026 NW Esplanade
Seattle, WA 98117
andrearodgers42@gmail.com
Tel: (206) 696-2851

/s/ Andrea K. Rodgers
ANDREA K. RODGERS
WSBA #38683
Law Offices of Andrea K. Rodgers
3026 NW Esplanade
Seattle, WA 98117
andrearodgers42@gmail.com
Tel: (206) 696-2851

/s/ Toby J. Marshall
Toby J. Marshall, WSBA #32726
Blythe H. Chandler, WSBA #43387
Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
tmarshall@terrellmarshall.com
bchandler@terrellmarshall.com
Tel: (206) 816-6603

/s/ Amy van Saun
AMY VAN SAUN, *pro hac vice*
CENTER FOR FOOD SAFETY
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
avansaun@centerforfoodsafety.org

CONSENT DECREE ~ 41

Tel: (415) 826-2770

*Counsel for Plaintiffs*

<u>/s/ Gary H. Baise</u>
Gary H. Baise, pro hac vice
D.C. Bar ID #194878
2201 Great Falls Street
Falls Church, VA 22043
Tel: 202-320-6336
Fax: 703-534-1753 vthedgerow@aol.com

<u>/s/ J. Jay Carroll</u>
J. Jay Carroll
WSBA No. 17424
HALVERSON | NORTHWEST LAW
GROUP P.C.
405 East Lincoln Avenue
P.O. Box 22550
Yakima, Washington 98907
Tel: (509) 248-6030
Fax: (509) 453-6880
jcarroll@hnw.law


*Counsel for Austin Jack DeCoster and DBD, et al.*